1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RICHARD P. BERNSTEIN, et al.,              No.  2:20-cv-02517-DAD-JDP

12                   Plaintiffs,

13           v.                                   ORDER GRANTING DEFENDANT'S
                                                 MOTION FOR PARTIAL SUMMARY
14    KEMPER INDEPENDENCE                        JUDGMENT
      INSURANCE COMPANY,
15                                               (Doc. No. 21)
                     Defendant.
16

17           This matter is before the court on the motion for partial summary judgment filed on behalf

18    of defendant on August 30, 2022.  (Doc. No. 21.)  The pending motion was taken under

19    submission on the papers.  (Doc. No. 26.)  For the reasons explained below, defendant's motion

20    for partial summary judgment will be granted.

21                                    **FACTUAL BACKGROUND**[1]

22           This case involves an insurance coverage dispute between plaintiffs Richard P. Bernstein

23    and Leah Ann Alcazar (collectively, "plaintiffs") and defendant Kemper Independence Insurance

24    Company ("defendant" or "Kemper Independence") arising from defendant's denial of a property

25    damage claim that plaintiffs submitted under their homeowner's insurance policy.

26    _____

27    [1]  The relevant facts that follow are undisputed unless otherwise noted and are derived from the
      undisputed facts as stated by defendant and responded to by plaintiffs (Doc. No. 27-2 ("DUF")),
28    as well as the undisputed facts as stated by plaintiffs and responded to by defendant (Doc. No. 29-
      2 ("PUF")).

                                                    1

Plaintiffs own a house at 5211 Bellwood Way, Carmichael, California 95608 ("the house") that was insured under a homeowner's policy issued by Kemper Independence for the period February 4, 2019 through February 4, 2020 ("the Policy"). (DUF ¶¶ 1, 2.) On or around December 24, 2019, plaintiff Bernstein submitted an insurance claim to Kemper Independence for property damage that, according to plaintiffs, "resulted from the accumulation of massive amounts of water under [the] house from a burst drainage pipe." (DUF ¶¶ 5, 7.) In response to the interrogatories defendant propounded on plaintiffs in this action, plaintiff Alcazar described the type of damage to the property she noticed in early 2019, which included, *inter alia*, misalignment of laundry room and living room doors, separation of cabinets from the wall in the laundry room, uneven flooring in kitchen and family room, cracks in counter tiles, cracks in ceiling, and cracks in sheetrock. (DUF ¶ 6.)

On or around January 3, 2020, an independent adjuster, Jamey Kim from Wardlaw Claims Service, inspected the house on Kemper Independence's behalf.[2] (DUF ¶ 10.) During this inspection, Mr. Kim did not go underneath the house. (PUF ¶ 23.) As reflected in the claim notes maintained by Kemper Independence, on January 7, 2020, Mr. Kim left the following voicemail for Kemper Independence's senior claims adjuster, Gary Watts:

> I inspected the loss location on 1/3/2019[3] and the damages appear to be from differential settling. The insured informed me that he had a contractor (A friend of his) look at the damages and crawled in the crawl space and determined that the damages were caused from a washing machine drain line failure (Collapse.) Could we get a structural engineer out to the loss location to help determine the cause of the loss? Thank you in advance.

(PUF ¶ 24.) The final loss report that Mr. Kim prepared recommended a full denial of plaintiffs' claim "as the damages appear to have been caused from differential settling." (DUF ¶ 11; Doc.

---

[2] Plaintiffs do not dispute that this inspection occurred, but they object to defendant's characterization of Mr. Kim as "independent." (DUF ¶ 10.) However, as defendant explains in its reply brief, an "independent adjuster" is a term of art in the insurance industry and refers to adjusters who are not employees of the insurance company. (Doc. No. 29 at 7.) Plaintiffs do not dispute that Mr. Kim was not an employee of Kemper Independence.

[3] This reference to 2019 appears to be in error, as it is undisputed that the inspection occurred in the year 2020, not 2019.

No. 21-5 at 108.)  Mr. Kim's final loss report did not mention that a structural engineer should

inspect the house; rather, his report merely stated in part:

> DIFFERENTIAL SETTLING:  The pier and beam portion of the dwelling appears to be settling while the concrete slab foundation is not.  This appears to be the cause of the cracking in painted stucco exterior, tile flooring in the living room, and cracking of the ceiling and wall drywall in a large portion of the interior.

> SUBROGATION:  No possible subrogation as damage solely the result of differential settling.

(DUF ¶ 11.)  Based on Mr. Kim's report and the photographs taken by him, Kemper

Independence concluded that the Policy did not cover the reported damage to plaintiffs' property.

(DUF ¶ 12.)

On or around January 9, 2020, Kemper Independence sent plaintiff Bernstein a letter,

which stated in part:  "The Policy does not provide coverage for this loss because your policy

excludes coverage for settling."  (DUF ¶ 13.)  That letter referred to the following relevant

provisions in the Policy:

> SECTION I – PERILS INSURED AGAINST COVERAGES A, B, AND C

> We insure against risk of direct loss to property described in Coverages A, B and C only if that loss is a physical loss to property.  We do not insure, however, for loss:

> 1. Excluded under Section I – Exclusions.
> . . .

> 3. Caused by:
> . . .

> > e. Any of the following:

> > > 1) Wear and tear, marring or deterioration;

> > > 2) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

> > > However, we do insure for loss caused by mechanical breakdown with respect to the coverage provided under Section I –Additional Coverages, Limited Water Back-up And Sump Discharge Or Overflow Coverage, paragraph b.
> > > . . .

3

      6)  ***Settling***, shrinking, bulging or expansion, including resultant cracking of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings.

(DUF ¶ 3) (emphasis added.)  The Policy also provides the following exclusions:

SECTION I – EXCLUSIONS

1.  We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.  These exclusions apply whether or not the loss event:
    1)  Results in widespread damage or affects a substantial area; or
    2)  Is caused by or results from an act of nature, an act of man or is otherwise caused.

. . .

1.b.  Earth Movement, meaning earthquake, including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss by:
    a. Fire; or
    b. Explosion;
ensues and then we will pay only for the ensuing loss.

. . .

2.  We do not insure for loss to property described in Coverages A and B caused by any of the following.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

. . .

    c.  Faulty, inadequate or defective:

. . .

    2)  Design, specification, workmanship, repair, construction, renovation, remodeling, grading, compaction;
    3)  Materials used in repair, construction, renovation or remodeling; or
    4)  Maintenance;

    of part or all of any property whether on or off the "residence premises."

(DUF ¶ 4.)  The claim denial letter also stated:  "If you know of any additional information that you believe we have not considered in reaching our decision to disclaim coverage, . . . , we invite you to provide it to us at your earliest convenience.  We will carefully consider any additional information you provide."  (Doc. No. 21-5 at 151.)

/////

4

On February 5, 2020, plaintiff Bernstein sent Mr. Watts a letter via email asking why Kemper Independence's claim denial letter did not address the following endorsement language in the Policy, titled "Exceptions to 3.e":

> Unless the loss is otherwise excluded, we cover loss to property covered under Coverages A, B or C resulting from an accidental discharge or overflow of water or steam from within a:
>
> i)   Storm drain or water, steam or sewer pipe off the "residence premises;" or
>
> ii)  Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises."  This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises," but only when necessary to repair the system or appliance.  However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises."

(PUF ¶¶ 26; 27.)  That same day, Mr. Watts responded by email and stated that "the cracks in the walls and siding were result of settling; not direct result of a plumbing leak; the cracks in the walls and siding would not be result of the plumbing leak in the crawlspace."  (PUF ¶ 28.) Plaintiff Bernstein replied to this email, stating that "[t]here was no cracking until the water flowing under the house from the busted pipe affected the piers and posts foundation, according to a structural engineer who actually inspected under the home, unlike your inspector, who told me it wasn't his role to go under the house but he would have someone come inspect."  (PUF ¶ 29.)  Plaintiffs did not provide Kemper Independence with a copy of that engineer's inspection results until May 15, 2020.  (PUF ¶ 30; Doc. No. 21-5 at 154.)  Specifically, on May 15, 2020, plaintiff Bernstein emailed Mr. Watts a copy of the one-page letter he received from his friend, Jerry L. Slinkard, a civil engineer for JLS Consulting, dated February 17, 2020, stating the following:

> Per your request, I inspected the underfloor of your residence to ascertain the cause of various newly observed problems to the home (such as cracking to newly painted walls, doors starting to stick, and cracking starting in the glass block wall).  Upon inspection, I found a 4" drain line under the laundry area near the front of the house had fractured.  No other problems or irregularities were present.  It is clear that the fracture to the drain line triggered the ensuing damages to your residence.

> Also confirming this diagnosis were watermarks along the inside perimeter foundation, the sudden cracking to newly painted walls, the doors starting to stick, and the cracks to the glass wall suddenly starting to appear.
>
> Now that the cause of the problem has been isolated, the property should be left to continue to dry out properly on its own, to be confirmed by visual inspection.   Then the house needs to be releveled, and then cosmetically repaired.

(DUF ¶¶ 8, 9; Doc. No. 27-3 at 14–15.)  On May 27, 2020, Mr. Watts responded to that email and asked plaintiff Bernstein to provide the contact number for Mr. Slinkard because Mr. Watts had additional questions regarding Mr. Slinkard's findings and needed Mr. Slinkard to submit photos from his inspection.  (Doc. No. 27-3 at 18.)

There is an entry by Mr. Watts in the claim notes reflecting that, on June 25, 2020, he communicated with plaintiff Bernstein "by email; advised that photos submitted by his engineer and damages reported did not appear to be related; advised that based upon policy language this would not be a covered loss."  (Doc. No. 21-5 at 102.)  According to plaintiffs, on June 30, 2020, plaintiff Bernstein sent a letter to the president of Kemper Corporation, purportedly copying Mr. Watts and defendant's CEO as recipients, in which plaintiff Bernstein questioned the denial of their claim.  (PUF ¶ 34.)  The claim notes do not reflect the receipt of any such letter, but they do reflect that, on July 17, 2020, Kemper Independence's adjuster Matthew Garrard noted: "Complaint received for review of coverage based on [insured's] engineer inspection.  Contacted Envista for inspection, requested budget as well for reserving and to inspect as soon as possible."  (Doc. No. 21-5 at 102; PUF ¶ 35.)  The claim notes further reflect that, on that same day, Mr. Garrard "[s]poke with insured [plaintiff Bernstein], advised of engineer inspection and will review for coverage once inspection is completed and report received."  (Doc. No. 21-5 at 101; PUF ¶ 35.)

On or around July 22, 2020, Envista Forensics, LLC ("Envista") inspected plaintiffs' property on Kemper Independence's behalf, including by inspecting under the house.  (DUF ¶ 14.)  Plaintiffs had discontinued use of the washing machine drainpipe in December 2019, so no further water had passed in the eight months preceding Envista's inspection.  (PUF ¶ 39.)  The Report of Findings prepared by Envista was signed by "George A. McCluskey, M.S., P.E., S.E.,

6

Structural Engineer," and was "Peer Reviewed by Van E. Fisher, P.E., Technical Director – Civil/Structural."  (DUF ¶ 16.)  In that report, Envista stated that it was retained by Kemper Independence "to determine whether the reported cracks to the interior drywall were related to the cracked drain pipe discovered below the laundry room," and it concluded that "the reported cracks in the exterior/interior finishes at various locations of the residence were caused by historical and ongoing non-uniform soil movement and subsequent differential foundation movement due to adverse soil conditions and were not related to the cracked drain pipe below the laundry room."  (DUF ¶ 15.)  Based on the Report of Findings prepared by Envista, Kemper Independence denied plaintiffs' property claim.  (DUF ¶ 17.)  On August 5, 2020, Kemper Independence sent plaintiff Bernstein a second claim denial letter, stating in part:

> Regarding this loss that occurred on September 1, 2019, we understand the facts to be that you have noticed exterior stucco cracks, interior drywall cracks to walls and ceilings, cracks in tile flooring and issues with door framings.  The damages were originally reported as direct result of plumbing leak in your crawlspace.  Our inspection revealed no evidence of water damage in the areas where the cracks and foundation issues were reported.  Since our original site inspection by our adjuster we have also sent an engineer to complete a property evaluation.  Based on reports provided by our adjuster and engineer it has been determined that cracks in the stucco, walls and flooring were not direct result of the plumbing leak in your crawlspace.  The cracking and other noted damage appears to be due to earth movement and settlement.

> Based on these facts, the Policy does not provide coverage for this loss because your policy excludes coverage for cracking of foundation walls, ceilings and flooring.  Your policy also excludes coverage for earth movement, settlement, construction and workmanship issues.

(DUF ¶ 18.)

## PROCEDURAL BACKGROUND

On August 14, 2020, plaintiffs filed the complaint initiating this action, which defendant removed to this court on December 18, 2020 on the basis of diversity jurisdiction.  (Doc. No. 1.)  Plaintiffs asserts three state law claims against defendant:  (1) breach of the implied covenant of good faith and fair dealing; (2) breach of the contractual duty to pay a covered insurance claim; and (3) financial elder abuse.  (Doc. No. 1 at 15–17.)  In their prayer for relief, plaintiffs seek,

/////

1   *inter alia*, "[p]unitive damages for Kemper's oppressive, malicious or fraudulent breach of the

2   duty of good faith and fair dealing, in an amount to be determined at trial." (*Id.* at 19.)[4]

3        On August 30, 2022, defendant filed the pending motion for partial summary judgment in

4   its favor as to plaintiffs' first and third claims, as well as plaintiffs' claim for punitive damages.

5   (Doc. No. 21.)  On November 8, 2022, plaintiffs filed an opposition to the motion and a request

6   for judicial notice.  (Doc. Nos. 27, 27-1.)  However, in their opposition brief, plaintiffs clarify that

7   while they oppose defendant's motion as to their claim of breach of the implied covenant of good

8   faith and fair dealing, they do not have a basis for opposing defendant's motion as to their claim

9   of financial elder abuse and as to any purported claim based on a breach of fiduciary duty.  (Doc.

10  No. 27 at 14.)  Accordingly, the court will grant defendant's unopposed motion for partial

11  summary judgment as to plaintiffs' financial elder abuse claim and plaintiffs' first claim to the

12  extent that claim is predicated on a claimed breach of fiduciary duty.

13       On November 22, 2022, defendant filed its reply in support of its motion for partial

14  summary judgment.  (Doc. No. 29.)  Defendant also concurrently filed an opposition to plaintiffs'

15  request for judicial notice and objections to the evidence plaintiffs submitted in support of their

16  opposition to the pending motion.  (Doc. Nos. 29-1, 29-3.)

17                                              **LEGAL STANDARD**

18       Summary judgment is appropriate when the moving party "shows that there is no genuine

19  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

20  Civ. P. 56(a).

---

21  [4]  Plaintiffs brought this action against defendant Kemper Independence Insurance Company and

22  defendant Kemper Corporation.  (*See* Doc. No. 1.)  The court granted defendant Kemper
    Corporation's motion for judgment on the pleadings and dismissed defendant Kemper

23  Corporation from this action on December 14, 2022.  (Doc. No. 34.)  On January 5, 2023, defense
    counsel filed a notice of lodging of a proposed judgment in defendant Kemper Corporation's

24  favor.  (Doc. No. 35.)  However, that proposed judgment was not accompanied by a motion
    seeking entry of final judgment.  Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure:

25  "When an action presents more than one claim for relief . . . or when multiple parties are
    involved, the court may direct entry of a final judgment as to one or more, but fewer than all,

26  claims or parties only if the court expressly determines that there is no just reason for delay."
    Fed. R. Civ. P. 54(b).  Because defendant Kemper Corporation has not filed a motion or request

27  offering any argument "that there is no just reason for delay," the court will disregard the
    standalone proposed judgment filed by defense counsel at this time.

28

1    In summary judgment practice, the moving party "initially bears the burden of proving the

2    absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

3    (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

4    may accomplish this by "citing to particular parts of materials in the record, including

5    depositions, documents, electronically stored information, affidavits or declarations, stipulations

6    (including those made for purposes of the motion only), admissions, interrogatory answers, or

7    other materials," or by showing that such materials "do not establish the absence or presence of a

8    genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

9    Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

10   "the moving party need only prove that there is an absence of evidence to support the non-moving

11   party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

12   Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for

13   discovery and upon motion, against a party who fails to make a showing sufficient to establish the

14   existence of an element essential to that party's case, and on which that party will bear the burden

15   of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

16   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

17   *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

18   whatever is before the district court demonstrates that the standard for the entry of summary

19   judgment . . . is satisfied."  *Id.* at 323.

20   If the moving party meets its initial responsibility, the burden then shifts to the opposing

21   party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

22   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

23   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

24   of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

25   admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

26   P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

27   (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

28   summary judgment.").  The opposing party must demonstrate that the fact in contention is

9

1    material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

2    dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

3    non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986)

4         In the endeavor to establish the existence of a factual dispute, the opposing party need not

5    establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

6    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

7    trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

8    Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

9    order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations

10   omitted).

11        "In evaluating the evidence to determine whether there is a genuine issue of fact," the

12   court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.

13   Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's

14   obligation to produce a factual predicate from which the inference may be drawn. *See Richards

15   v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902

16   (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than

17   simply show that there is some metaphysical doubt as to the material facts. . . . Where the record

18   taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

19   'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87 (citation omitted).

20                                    **ANALYSIS**

21        As a preliminary matter, the court will first address defendant's evidentiary objections and

22   plaintiffs' request for judicial notice. Then the court will consider whether defendant is entitled

23   to summary judgment in its favor as to plaintiffs' claim of breach of the implied covenant of good

24   faith and fair dealing and claim for punitive damages.

25   **A.    Plaintiffs' Request for Judicial Notice**

26        Pursuant to Federal Rule of Evidence 201(b), a court may "judicially notice a fact that is

27   not subject to reasonable dispute because it:  (1) is generally known within the trial court's

28   /////

1   territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

2   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

3          In support of their opposition to the pending motion, plaintiffs request that the court take

4   judicial notice of three civil jury instructions approved by the Judicial Council of California

5   (CACI No. 2332, CACI No. 2306, CACI No. 2350) and two webpages purporting to show that

6   Envista is a well-known defense engineering firm.  (Doc. No. 27-1; *see also* PUF ¶ 37.)  Plaintiffs

7   do not cite any authority to support their request for judicial notice of CACI jury instructions.

8   Nor does it appear that those jury instructions have any relevance to the pending motion.  As

9   defendant notes in its opposition to plaintiffs' request for judicial notice, jury instructions are not

10  law and do not establish legal precedent.  (Doc. No. 29-1 at 2) (citing *People v. Diaz*, 60 Cal. 4th

11  1176, 1187 n.6 (2015)).  Indeed, the California Supreme Court has "caution[ed] that jury

12  instructions, whether published or not, are not themselves the law, and are not authority to

13  establish legal propositions or precedent."  *People v. Morales*, 25 Cal. 4th 34, 48 n.7 (2001).

14  Even if jury instructions were the law, that would not make them the appropriate subject of

15  judicial notice.  Accordingly, the court will deny plaintiffs' request for judicial notice of the

16  CACI instructions.

17         As for the two webpages, plaintiffs argue that public websites may be judicially noticed.

18  (Doc. No. 27-1 at 2.)  But here, plaintiffs are not asking the court to judicially notice the existence

19  of these two non-party webpages; rather, plaintiffs request that the court accept the truth of the

20  statements appearing on those webpages.  (*Id.*)  Such a request is not proper.  *See Khoja v.*

21  *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because the document itself

22  is susceptible to judicial notice does not mean that every assertion of fact within that document is

23  judicially noticeable for its truth.")  Accordingly, the court will deny plaintiffs' request for

24  judicial notice as to the webpages as well.

25         For these reasons, plaintiffs' request for judicial notice (Doc. No. 27-1) will be denied.

26  **B.     Defendant's Objections to Plaintiffs' Evidence**

27         Defendant has filed objections to certain evidence submitted by plaintiffs in support of

28  their opposition to the pending motion for partial summary judgment.  (Doc. No. 29-3.)

1      First, defendant objects to two statements plaintiff Bernstein made in a declaration that

2   he filed in support of plaintiffs' opposition to the pending motion on the grounds that those

3   statements constitute hearsay.  (*Id.* at 2–3.)  "At the summary judgment stage, [courts] do not

4   focus on the admissibility of the evidence's form," courts "instead focus on the admissibility of

5   its contents."  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (citing *Block v.

6   City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)).  "[H]earsay evidence is generally

7   inadmissible unless a federal statute or rule provides otherwise," and courts have held that

8   motions for summary judgment and oppositions thereto cannot be supported by hearsay absent an

9   exception or exclusion.  *Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157 (S.D.

10  Cal. 2022) (citing Fed. R. Evid. 802, 801(c)).  The first objected-to statement by plaintiff

11  Bernstein—"I asked Mr. Kim if he was going to look under the house and he said no"—is

12  hearsay and thus inadmissible.  Though, the court questions the relevancy of this statement in

13  light of the undisputed fact that Mr. Kim did not go underneath the house.  Nevertheless, the court

14  sustains defendant's objection to plaintiff Bernstein's statement regarding what he asked Mr. Kim

15  and what Mr. Kim said in response.

16      However, the second objected-to statement by plaintiff Bernstein—that he sent a letter to

17  the CEO of Kemper Corporation on June 30, 2020, a copy of which he has attached to his

18  declaration—is not inadmissible hearsay with regard to its contents because plaintiff Bernstein

19  could testify as a witness at trial and sponsor admission of the letter he wrote into evidence.  *See

20  Cherewick*, 578 F. Supp. 3d at 1157 ("[A]s long as a court finds that hearsay evidence could be

21  presented in an admissible form at trial (i.e., through testimony from a witness laying the

22  foundation for an exception or because the Court finds the evidence to be non-hearsay), it may

23  consider the evidence when ruling on the motion for summary judgment.").  While defendant is

24  correct in asserting that plaintiffs have proffered no evidence that the purported recipients

25  *received* this letter, any such absence of substantiating evidence merely speaks to the weight and

26  credibility of plaintiff Bernstein's statement, which courts do not consider at the summary

27  judgment stage of litigation in any event.  *See also T.W. Elec. Serv., Inc.*, 809 F.2d at 630 ("[A]t

28  this [summary judgment] stage of the litigation, the judge does not weigh conflicting evidence

1    with respect to a disputed material fact.  Nor does the judge make credibility determinations with

2    respect to statements made in affidavits, answers to interrogatories, admissions, or depositions.")

3    (internal citation omitted).  Accordingly, defendant's objection to plaintiff Bernstein's statement

4    regarding the June 30, 2020 letter is overruled.

5         Second, defendant objects to the portions of plaintiffs' counsel's declaration which

6    purport to attach as exhibits copies of the correspondence between plaintiff Bernstein and Mr.

7    Watts, namely plaintiff Bernstein's February 5, 2020 and May 15, 2020 letters to Mr. Watts sent

8    via email, on the ground that plaintiffs' counsel lacks personal knowledge of those

9    communications and thus cannot properly authenticate the documents.  (Doc. No. 29-3 at 3–5.)

10   Defendant's objections are well taken to some extent.  *See Orr*, 285 F.3d at 773

11   ("[U]nauthenticated documents cannot be considered in a motion for summary judgment.").

12   However, defendant does not meaningfully contest the authenticity of the attached letters.

13   Notably, the evidence before the court on summary judgment shows that Mr. Watts responded to

14   those letters via email.  In addition, the May 15, 2020 letter from plaintiff Bernstein to Mr. Watts

15   enclosed a copy of Mr. Slinkard's letter, and defendant does not challenge the authenticity of Mr.

16   Slinkard's letter.  To the contrary, defendant relies on Mr. Slinkard's letter as evidence in support

17   of its pending motion.  In this context, defendant's authenticity objection rings hollow given that

18   that it was plaintiff Bernstein's May 15, 2020 letter that provided defendant with a copy of Mr.

19   Slinkard's letter in the first place.  (*See* Doc. No. 21-5 at 154.)  Moreover, defendant submitted

20   Mr. Slinkard's letter to the court as evidence through the declaration of Mr. Garrard, who

21   declared that a copy of Mr. Slinkard's letter "was received by Kemper in the regular course of

22   business and has been maintained in its claim file."  (Doc. No. 21-3 at 3.)  For these reasons, the

23   court will overrule defendant's objections as to the authenticity of these letters, even though the

24   letters were provided to the court as exhibits to plaintiffs' counsel's declaration.

25         Third, and finally, defendant objects to certain statements made by Mr. Slinkard in a

26   declaration that plaintiffs filed in support of their opposition to the pending motion.  Having

27   reviewed the objected-to material, the court finds that these portions of Mr. Slinkard's declaration

28   are not relevant to the pending motion for partial summary judgment because the true cause of the

damage to plaintiffs' home and whether the Policy in fact covers such damages are not presently at issue by way of the pending motion for partial summary judgment.  Such evidence may be relevant to plaintiffs' claim that defendant breached its contractual duty to pay a covered insurance claim, but defendant has not moved for summary judgment in its favor as to that claim. Accordingly, the court need not address defendant's evidentiary objections regarding Mr. Slinkard's declaration.

**C.**     **Defendant's Motion for Partial Summary Judgment**

      1.    <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007), *as modified* (Dec. 19, 2007); *see also Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 345 (2001), *as modified on denial of reh'g* (July 30, 2001) ("Every contract imposes on each party an implied duty of good faith and fair dealing.").  "The insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests," and "[w]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979) (citation omitted).  "The elements of a claim for tortious insurance bad faith are that benefits due under the policy were withheld and that the withholding was unreasonable." *Gentry v. State Farm Mut. Auto. Ins. Co.*, 726 F. Supp. 2d 1160, 1166 (E.D. Cal. 2010) (citing *Wilson*, 42 Cal. 4th at 720).

"Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).  "[W]here there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." *Chateau Chamberay Homeowners Ass'n*, 90 Cal. App. 4th at 347.  This so-called "genuine dispute doctrine" "does not relieve an insurer from its obligation to thoroughly and fairly investigate, process[,] and evaluate the insured's claim," and "[a] *genuine* dispute exists only where the insurer's position is maintained

14

1   in good faith and on reasonable grounds." *Wilson*, 42 Cal. 4th at 723.  For example, the doctrine

2   "may be applied where the insurer denies a claim based on the opinions of experts," *Fraley v.*

3   *Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000), though reliance on experts "will not

4   *automatically* insulate an insurer from a bad faith claim based on a biased investigation."

5   *Chateau Chamberay Homeowners Ass'n*, 90 Cal. App. 4th at 348.  "Even when insurers rely on

6   experts, courts must deny summary judgment on bad faith claims when evidence shows 'the

7   insurer dishonestly selected its experts[,] the insurer's experts were unreasonable[,][or] the insurer

8   failed to conduct a thorough investigation." *Anderson v. State Farm Mut. Auto. Ins. Co.*, No.

9   2:06-cv-2843 JAM-KJM, 2008 WL 2441086, at *5 (E.D. Cal. June 13, 2008).

10   　　　"Although the reasonableness of an insurer's claims-handling conduct is ordinarily a

11   question of fact for the jury, 'it becomes a question of law where the evidence is undisputed and

12   only one reasonable inference can be drawn from the evidence.'" *Thomas v. Nationwide Mut.*

13   *Ins. Co.*, No. 21-cv-6296-MWF-MAR, 2023 WL 2484322, at *6 (C.D. Cal. Feb. 15, 2023)

14   (quoting *Chateau Chamberay Homeowners Ass'n*, 90 Cal. App. 4th at 346).  If the evidence

15   before the court on summary judgment "demonstrates the existence of a genuine dispute about

16   plaintiff's claim and that the insurer's position 'was reached reasonably and in good faith,' the

17   insurer is entitled to summary judgment." *Id.* (quoting *Wilson*, 42 Cal. 4th at 724).

18   　　　Here, defendant argues that it is entitled to summary judgment on plaintiffs' claim of

19   breach of the covenant of good faith and fair dealing because the evidence submitted by the

20   parties shows that there was a "genuine dispute" as to whether coverage exists under the Policy

21   for the damages to the house.  (Doc. No. 21-1 at 7.)  Specifically, plaintiffs and Mr. Slinkard

22   concluded that the damages to the house were caused by a broken drain pipe below the laundry

23   room, whereas defendant and its independent expert Envista concluded that the damages "were

24   caused by historical and ongoing non-uniform soil movement and subsequent differential

25   foundation movement due to adverse soil conditions and were not related to the cracked drain

26   pipe below the laundry room."  (*See* DUF ¶ 15.)  Defendant emphasizes that its final decision to

27   deny coverage on plaintiffs' insurance claim was based on the detailed, 33-page report provided

28   by Envista following its investigation of the house, which included inspecting under the house.

(Doc. Nos. 21-1 at 16–17; 29 at 9–12.)  Defendant also emphasizes that unlike the one-page letter from Mr. Slinkard (a friend of plaintiffs) stating his conclusions regarding the cause of the damage without attaching any photographs or explanation as to how he reached such conclusions, the Envista report "contains photographs, soil rating data[,] and a long discussion of how it arrived at its conclusion."  (Doc. No. 29 at 12.)  The court agrees with defendant that, even if the trier of fact were to find that Mr. Slinkard's conclusions as to the cause of the damage are ultimately correct, and Envista's conclusions are wrong, such a resolution of the conflicting expert opinions in plaintiffs' favor, without more, would not render defendant's reliance on Envista's report unreasonable.  *See Gentry*, 726 F. Supp. 2d at 1166 (quoting *Wilson*, 42 Cal. 4th at 720) ("Even where benefits are ultimately found to be due, a withholding was reasonable, and therefore not in bad faith, if the insurer conducted a 'thorough[] and fair[]' investigation, after which there remained a 'genuine dispute' as to coverage liability.").

In their opposition, plaintiffs essentially argue that defendant's investigation was not thorough and prompt because (1) the first inspector, Mr. Kim, reached his conclusion that the damages were caused by differential settling without inspecting underneath the house; and (2) the second inspection by Envista did not occur until several months later, on July 22, 2020.  (Doc. No. 27 at 6–12.)  The court is not persuaded by either argument.

First, plaintiffs' focus on purported shortcomings in Mr. Kim's inspection is misplaced.  Although Mr. Kim left a voicemail inquiring as to whether defendant could send "a structural engineer out to the loss location to help determine the cause of the loss" (PUF ¶ 24), Mr. Kim's final loss report did not mention this inquiry nor state that he was unable to determine the cause of the loss without such assistance.  At that time, defendant also did not yet have a copy of Mr. Slinkard's letter stating his opinion as to the cause of the loss.  More importantly, although defendant initially relied on Mr. Kim's final loss report in deciding to deny plaintiffs' insurance claim, any purported deficiencies with Mr. Kim's inspection (such as his failure to inspect underneath the house) are immaterial in light of defendant's retention of Envista to conduct a second inspection of the property (which included inspecting underneath the house) and defendant's reliance on Envista's thorough report in making its final decision to deny plaintiffs'

insurance claim.  Plaintiffs do not offer any evidence to suggest that Envista was biased in its investigation or that its report is fraudulent; rather, plaintiffs merely suggest that Envista is not "independent" because it provides its services to insurance companies.  (Doc. No. 27 at 5–6, 8.) Such an unsupported argument is insufficient to survive summary judgment.  *See 501 E. 51st St., Long-Beach-10 LLC v. Kookmin Best Ins. Co.*, 47 Cal. App. 5th 924, 938 (2020) ("There is no dispute that defendants based their claim denial on the final expert report, and there is no evidence that report was contrived or false.  As the trial court aptly stated, 'Initial opinions are often superseded by further investigation.'"); *see also Sekera v. Allstate Ins. Co.*, No. 14-cv-1162-JGB-DTB, 2017 WL 6550425, at *9 (C.D. Cal. Sept. 19, 2017), *aff'd*, 763 F. App'x 629 (9th Cir. 2019) (finding no evidence of bias even though the defendant's independent expert did "99 percent defense" work and defendant previously hired the expert); *see also Cardiner v. Provident Life & Accident Ins. Co.*, 158 F. Supp. 2d 1088, 1101 (C.D. Cal. 2001) ("The mere fact that these doctors have been hired by insurers rather than insureds does not support bias.  Indeed, if this were the case, then most experts in any case would be deemed bias.").

Second, given that plaintiff Bernstein did not actually provide Mr. Slinkard"s February 17, 2020 letter to defendant until May 15, 2020, the timing of Envista's investigation (July 22, 2020) does not suggest a lack of promptness.  Less than two weeks after receiving Mr. Slinkard's letter, Mr. Watts asked plaintiff Bernstein for Mr. Slinkard's contact information because Mr. Watts had additional questions and needed the photos from Mr. Slinkard's inspection.  (Doc. No. 27-3 at 18.)  In this context, the fact that Envista did not inspect the property until July 22, 2020 does not suggest that defendant's investigation was unreasonably delayed.  *See Kerrigan v. Allstate Ins. Co.*, No. 21-cv-55730, 2022 WL 14476372, at *1 (9th Cir. Oct. 25, 2022) ("Delay while an insurer seeks information and investigates an insured's claim is not considered unreasonable.").  Nor have plaintiffs come forward with any evidence that the conditions beneath the house changed between February 17, 2020 and July 22, 2020.

Based on the evidence before the court on summary judgment, the court finds that, "even viewing the facts in the light most favorable to the plaintiff[s], a reasonable jury could not conclude that the insurer acted unreasonably" under these circumstances.  *Thomas*, 2023 WL

2484322, at *5–6 (citing *Wilson*, 42 Cal. 4th at 723).  Defendant has shown "the absence of triable issues as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith."  *Wilson*, 42 Cal. 4th at 724 (internal citation omitted).

Accordingly, defendant's motion for summary judgment in its favor on plaintiffs' claim of breach of the implied covenant of good faith and fair dealing will be granted.

2.   Punitive Damages

Although "[t]he same evidence is relevant both to the finding of bad faith and the imposition of punitive damages," "the conduct required to award punitive damages for the tortious breach of contract is of a different dimension than that required to find bad faith."  *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 890 (2000), *as modified on denial of reh'g* (Mar. 29, 2000) (citing *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1286 (1994)) (modifications omitted).  "[T]he evidence in support of the award of punitive damages must satisfy a distinct and far more stringent standard."  *Id.*  "The standard for punitive damages is statutory.  The California Civil Code provides that the plaintiff has to prove 'by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.'"  *Gentry*, 726 F. Supp. 2d at 1171 (quoting Cal. Civ. Code § 3294).

"This higher clear and convincing evidentiary standard applies at every stage of the litigation process, including summary adjudication," and "thus, a plaintiff who is not able to survive summary judgment on an insurance bad faith claim[ ] is also unable to survive summary judgment on a related claim for punitive damages." *Adams v. Allstate Ins. Co.,* 187 F. Supp. 2d 1219, 1231 (C.D. Cal. 2002); *see also Anderson*, 2008 WL 2441086, at *9 (granting summary judgment in the defendant insurer's favor on plaintiff's punitive damages claim after concluding that plaintiff's bad faith claim failed due to a genuine dispute as to the amount of insurance benefits owed).

Here, defendant moves for summary judgment in its favor as to plaintiff's punitive damages claim because plaintiffs have not proffered any evidence in support of this claim, let alone evidence sufficient to establish that defendant acted with oppression, fraud, or malice. (Doc. No. 21-1 at 19–21.)  Indeed, as defendant emphasizes in its reply brief (Doc. No. 29 at 19),

18

plaintiffs do not mention their punitive damages claim nor respond to defendant's arguments regarding punitive damages in their opposition to the pending motion.  Thus, it appears that plaintiffs have implicitly conceded that they cannot maintain their punitive damages claim.  In addition to their apparent concession in this regard, plaintiffs have not submitted any evidence to the court on summary judgment to demonstrate that defendant acted with oppression, fraud, or malice.

Accordingly, defendant is entitled to summary judgment in its favor on plaintiffs' punitive damages claim as well.

## CONCLUSION

For the reasons explained above,

1. Plaintiffs' request for judicial notice (Doc. No. 27-1) is denied;

2. Defendant's motion for partial summary judgment (Doc. No. 21) is granted;

    a. Defendant's motion for summary judgment on plaintiffs' claim of breach of the implied covenant of good faith and fair dealing is granted;

    b. Defendant's motion for summary judgment on plaintiffs' financial elder abuse claim is granted; and

    c. Defendant's motion for summary judgment on plaintiffs' claim for punitive damages is granted;

3. This case proceeds only on plaintiffs' breach-of-contract claim; and

4. At this time, the court will not address the notice of lodging of a standalone "proposed judgment" in favor of defendant Kemper Corporation (Doc. No. 35) filed on January 5, 2023.

IT IS SO ORDERED.

Dated:   **April 24, 2023**

_____
UNITED STATES DISTRICT JUDGE